**Laura I. WHITE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–99–104–CR.**

Court of Appeals of Texas,
Waco.

June 6, 2001.

Rehearing Overruled June 27, 2001.

George R. Trimber, Law Offices of George R. Trimber, P.C., David Palmer, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Asst. Crim. Dist. Atty., Debra Ann Windsor, Asst. Crim. Dist. Atty., Fort Worth, for appellee.

Before Chief Justice DAVIS, Justice VANCE and Justice GRAY.

## OPINION

DAVIS, Chief Justice.

A jury convicted Laura I. White of five counts of failure to report child abuse and

assessed her punishment at 180 days' confinement on each count. She claims in five points that the court erred by denying: (1) her motion for directed verdict in which she alleged that the evidence was factually insufficient to support her convictions; (2) her requested jury charge on the statute of limitations as to the first count of the information; (3) her motion to dismiss in which she contends that the statute on which her prosecution is based is unconstitutionally vague; (4) her motion to quash in which she avers that the information does not provide adequate notice of the manner and means by which she committed the offenses; and (5) her objection to the admission in evidence of a photograph depicting a wooden paddle seized from her home without a warrant.

## BACKGROUND

A Tarrant County grand jury presented an indictment against Laura on August 20, 1998.[1] The indictment alleges that on or about August 31, 1997, she:

did then and there, having cause to believe that, the physical and mental health and welfare of a child, [C.W], had been affected by abuse and neglect, and would further be adversely affected, knowingly fail to report in accordance with section 34.02 of the Family Code of Texas in that the Defendant did not notify any law enforcement agency nor the Texas Department of Human Resources.

The State filed an information on March 10, 1999 which contains similar allegations.

Count one of the information alleges that on or about November 15, 1996, Laura:

did then and there, having cause to believe that the physical or mental health or welfare of a child, [C.W], had been or may be directly affected by abuse or neglect, knowingly failed [sic] to report in accordance with section 261.103 of the Family Code of Texas in that the Defendant did not notify any local or state law enforcement agency nor the Texas Department of Protective and Regulatory Services.

The information contains four additional counts which allege that she committed similar offenses on or about August 31, 1997, September 19, 1997, October 15, 1997, and February 13, 1998.

Laura filed a motion to quash the information alleging that it is defective because it fails to specify "those acts that she failed to report" and thus does not "allege the specific acts which constitute and give rise to the duty of this defendant to act." She also filed a motion to dismiss contending that section 261.109 of the Family Code is unconstitutionally vague as applied to her.[2] The court denied both motions.

The alleged victim C.W. is the daughter of Laura's former husband Eric from another relationship.[3] Laura and Eric married in June 1994. At the time, they both worked as officers for the Fort Worth Police Department. They did not learn of C.W.'s existence until two years later. As Laura and Eric began visiting C.W. in her maternal grandmother's home, they noticed bruising and other signs of abuse and neglect. Laura testified that she reported

---

1. Because this case also involves Laura White's former husband Eric, we refer to both of them hereinafter by their first names to avoid confusion.

2. Section 261.109 of the Family Code proscribes the offense of failure to report child abuse. See Tex.Fam.Code Ann. § 261.109 (Ver-

non 1996). The term "section" as used hereinafter refers to a section of the Family Code unless otherwise indicated.

3. C.W. was born in March 1994. She was less than four years old when the events giving rise to Laura's prosecution occurred.

these observations to the Child Protective Services Division of the Department of Protective and Regulatory Services ("CPS") on the advice of her attorney. According to Laura, CPS declined to investigate because a custody suit was already pending and C.W. would soon be in the Whites' home. C.W. came to live with Laura and Eric in October 1996. The family court awarded them managing conservatorship one month later.[4]

At trial, the State presented the testimony of witnesses who observed severe bruising on C.W. on several occasions after she went to live with the Whites. These witnesses all testified that they discussed their observations with Laura, who never reported them to CPS. A babysitter did report her observations to CPS, which investigated but failed to substantiate the allegations. Laura and Eric separated in May 1997. Several of the State's witnesses testified that C.W. remained primarily in Laura's care after the separation. Laura testified, however, that C.W. remained in Eric's care after the separation. The sitter who had previously called CPS noticed severe bruising on C.W. again on February 14, 1998 when she kept C.W. while Laura and Eric went to dinner.[5] She called the police. The responding officers observed bruising on C.W.'s thigh, buttocks, and in both ears. They then went to Laura's house to discuss their findings.

According to a CPS caseworker, the Whites denied any knowledge of these bruises. However, Laura did volunteer that she had caused a bruise on the front of C.W.'s thigh several days earlier when she had spanked C.W. with a wooden paddle for lying about a bathroom accident. She also told the caseworker privately that Eric might have caused the other bruises.

Laura presented several witnesses to counter the State's evidence. She denied that she had seen any of the injuries testified to by the State's witnesses or that anyone had called them to her attention. Her witnesses testified that C.W. lived with Eric after Laura and he separated. They stated that Laura was not with C.W. on the dates alleged in counts two through four of the information. Another babysitter testified that Eric had full custody of C.W. after the separation and that she regularly babysat C.W. between September and December of 1997. She never saw Laura with C.W. during this time period. Laura likewise testified that she had little contact with C.W. after the separation.

The State presented the rebuttal testimony of one witness who stated that she had seen Laura with C.W. at the home of the sitter who reported the suspected abuse at least once per week and on three or four weekends between August and October of 1997.

## MOTION TO QUASH

Laura contends in her fifth point that the court erred by denying her motion to quash the information because it does not provide adequate notice of the manner and means by which she committed the offenses alleged. Each count alleges in pertinent part that, on the occasion in ques-

---

4. The testimony on this issue is unclear, and a copy of the court's order does not appear in the record. Laura testified that they received "full custody in November, but it was under temporary orders."

5. The sitter testified that Laura and Eric had never "completely" separated. Laura testified that Eric and she had little contact with each other until he approached her about moving back into her home. Eric spent the night in Laura's home that night after they went to dinner. C.W. spent the night in the sitter's home.

tion, Laura "did then and there, having cause to believe that the physical or mental health or welfare of a child, [C .W.], had been or may be directly affected by abuse or neglect, knowingly failed [sic] to report."

■ According to Laura, this allegation does not suffice because it does not provide "specific notice as to what type of abuse occurred to the child, how the abuse was alleged to [sic] occurred to the child, or when the actual abuse occurred to the child, if any, and in who's [sic] presence." In her case, the State did not have to prove the latter three (*i.e.*, how, when, or in whose presence the abuse occurred). However, the State did have to show facts within Laura's knowledge which gave her cause to believe that C.W. had been "affected by abuse." [6] *See* TEX.FAM.CODE ANN. § 261.109(a) (Vernon 1996).

Section 261.001 defines the term "abuse" to include the following:

(A) mental or emotional injury to a child that results in an observable and material impairment in the child's growth, development, or psychological functioning;

(B) causing or permitting the child to be in a situation in which the child sustains a mental or emotional injury that results in an observable and material impairment in the child's growth, development, or psychological functioning;

(C) physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child, including an injury that is at variance with the histo-

ry or explanation given and excluding an accident or reasonable discipline by a parent, guardian, or managing or possessory conservator that does not expose the child to a substantial risk of harm;

(D) failure to make a reasonable effort to prevent an action by another person that results in physical injury that results in substantial harm to the child;

(E) sexual conduct harmful to a child's mental, emotional, or physical welfare;

(F) failure to make a reasonable effort to prevent sexual conduct harmful to a child;

(G) compelling or encouraging the child to engage in sexual conduct as defined by Section 43.01, Penal Code;

(H) causing, permitting, encouraging, engaging in, or allowing the photographing, filming, or depicting of the child if the person knew or should have known that the resulting photograph, film, or depiction of the child is obscene as defined by Section 43.21, Penal Code, or pornographic;

(I) the current use by a person of a controlled substance as defined by Chapter 481, Health and Safety Code, in a manner or to the extent that the use results in physical, mental, or emotional injury to a child; or

(J) causing, expressly permitting, or encouraging a child to use a controlled substance as defined by Chapter 481, Health and Safety Code.

TEX.FAM.CODE ANN. § 261.001(1) (Vernon Supp.2001).[7] Therefore, the State had to

---

6. Although the information alleges that Laura had cause to believe that C.W. "had been or may be directly affected by abuse or neglect," the record reflects that the State's theory of the case is that, on each of the occurrences in question, Laura had cause to believe that C.W. had been abused (*i.e.*, "had been directly affected by abuse"). Laura's brief likewise

focuses on the question of whether she had cause to believe C.W. had been abused. Accordingly, we limit our discussion to this aspect of the charges.

7. The Legislature added subdivisions (I) and (J) to section 261.001(1), effective September 1, 1997. *See* Act of May 19, 1997, 75th Leg.,

establish that Laura knew of facts which gave her cause to believe that C.W. had been directly affected by one of the ten types of abuse listed above.

"[W]hen a statute defines the manner or means of commission in several alternative ways, an indictment will fail for lack of specificity if it neglects to identify which of the statutory means it addresses." *State v. Mays*, 967 S.W.2d 404, 407 (Tex.Crim. App.1998). Therefore, "[i]n the face of a motion to quash . . ., an information must provide more specific allegations if the 'statute identifies more than one method by which it can be violated.'" *Tullous v. State*, 23 S.W.3d 195, 196–97 (Tex.App.— Waco 2000, pet. ref'd) (quoting *Smith v. State*, 895 S.W.2d 449, 453 (Tex.App.— Dallas 1995, pet. ref'd)).

■ The Family Code provides ten different definitions for the term "abuse." A person can be prosecuted under section 261.109 if she has cause to believe that a child has been abused in any of those ten distinct manners and fails to report it. Accordingly, the court should have required the State to provide more specificity regarding the type(s) of abuse at issue in response to Laura's motion to quash. *See id.* Because the court erred by failing to do so, we must determine whether this error requires reversal. *See Saathoff v. State*, 891 S.W.2d 264, 267 (Tex.Crim.App. 1994) (citing *Adams v. State*, 707 S.W.2d 900 (Tex.Crim.App.1986)); *Flores v. State*, 33 S.W.3d 907, 919 (Tex.App.—Houston [14th Dist.] 2000, no pet.).

■ A complaint that an information does not provide adequate notice alleges a defect of form. *See Olurebi v. State*, 870 S.W.2d 58, 61 (Tex.Crim.App.1994); *Flores*, 33 S.W.3d at 919; *see also* TEX. CODE CRIM.PROC.ANN. arts. 21.02(7), 27.09(2) (Vernon 1989). We must not reverse a judgment because of a defect in the form of an information unless this defect has "prejudice[d] the substantial rights of the defendant." [8] TEX.CODE CRIM.PROC.ANN. art. 21 .19 (Vernon 1989); *see also Saathoff*, 891 S.W.2d at 267; *Adams*, 707 S.W.2d at 902; *Flores*, 33 S.W.3d at 919. *Adams* provides the analysis we must follow to answer this question. "If sufficient notice is given, this ends our inquiry. If not, the next step is to decide whether, in the context of the case, this had an impact on the defendant's ability to prepare a defense, and, finally, how great an impact." *Adams*, 707 S.W.2d at 903; *accord Flores*, 33 S.W.3d at 919.

■ We have already determined that the information did not provide sufficient notice to Laura of the type of abuse at issue. Accordingly, we examine the entire record to determine whether this had an impact on her ability to prepare a defense. *See id.*

Beginning with opening statements, the record reflects that the parties prosecuted and defended this case under the assumption that C.W. had been physically abused on each of the occasions in question. *See* TEX.FAM.CODE ANN. § 261.001(1)(C). None

R.S., ch. 575, §§ 10, 38, 1997 Tex.Gen.Laws 2012, 2015–16, 2023. Thus, they would not apply to counts one and two of the information against White (assuming the offenses occurred on the specific dates alleged).

8. Article 21.19 provides a statutory harm analysis for this type of error much as article 36.19 provides a statutory harm analysis for charge error. *Compare* TEX.CODE CRIM.PROC. ANN. art. 21.19 (Vernon 1989) *with* TEX.CODE

CRIM.PROC.ANN. art. 36.19 (Vernon 1981). A harm analysis mandated by statute necessarily supercedes those provided in Rule of Appellate Procedure 44.2. *See* TEX.GOV.CODE ANN. § 22.108 (Vernon Supp.2001); *but see Ferrel v. State*, 16 S.W.3d 861, 867 n. 6 (Tex.App.— Houston [14th Dist.] 2000, pet. granted) (applying both statutory and rule-based harm analyses).

of the other statutory definitions for "abuse" were even arguably raised. Laura's defense revolved around her position that she did not have access to C.W. during the time period at issue and that she never saw any of the bruises the State's witnesses testified that they had called to her attention. She challenged the credibility of the State's witnesses alleging that they were biased against her.

Because both parties clearly focused on a theory of physical abuse under section 261.001(1)(C), we conclude that the trial court's failure to require more specificity in the information had little or no impact on Laura's ability to prepare her defense. *See Flowers v. State*, 890 S.W.2d 906, 913–14 (Tex.App.—El Paso 1994, no pet.); *Olurebi v. State*, 875 S.W.2d 807, 807–08 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd); *Karnes v. State*, 873 S.W.2d 92, 100 (Tex.App.—Dallas 1994, no pet.). Accordingly, we overrule Laura's fifth point.

## FACTUAL SUFFICIENCY

Laura's first point challenges the factual sufficiency of the evidence to support her convictions. She does not challenge the State's proof as to particular elements. *See Purvis v. State*, 4 S.W.3d 118, 119–20 (Tex.App.—Waco 1999, no pet.). Rather, she contends without elaboration that she "provided evidence contrary to the jury's verdict." The State asks us to overrule the point because it is inadequately briefed. However, we will address the point in the interest of justice. *See Aldrich v. State*, 928 S.W.2d 558, 559 n. 1 (Tex.Crim.App.1996); *Chimney v. State*, 6 S.W.3d 681, 688 (Tex.App.—Waco 1999, pet. filed).

### Standard of Review

■ When presented with a factual insufficiency claim, we discard the prism of the light most favorable to the verdict.

*See Johnson v. State*, 23 S.W.3d 1, 6–7 (Tex.Crim.App.2000); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996); *Perkins v. State*, 19 S.W.3d 854, 856 (Tex. App.—Waco 2000, pet. ref'd). We "set[ ] aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Johnson*, 23 S.W.3d at 7 (quoting *Clewis*, 922 S.W.2d at 129). This occurs when "the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Id.* at 11; *Perkins*, 19 S.W.3d at 856.

■ We conduct "a neutral review of all the evidence, both for and against the [verdict]." *Johnson*, 23 S.W.3d at 11; *accord Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997). We review the evidence tending to prove the contested issue, "and compare[ ] it with the evidence that tends to disprove that [issue]." *Johnson*, 23 S.W.3d at 7; *accord Santellan*, 939 S.W.2d at 164. We give appropriate deference to the jury's decision and do not substitute our judgment for theirs. *Johnson*, 23 S.W.3d at 7; *accord Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997). We do not "set aside a jury verdict merely because [we] feel that a different result is more reasonable." *Clewis*, 922 S.W.2d at 135 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986)); *accord Cain*, 958 S.W.2d at 407.

■ Section 261.109(a) provides, "A person commits an offense if the person has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report as provided in this chapter." Tex.Fam.Code Ann. § 261.109(a). Thus, the elements for this offense are that: (1) the defendant; (2) had cause to believe that a child had

been or may be abused or neglected; and (3) knowingly failed to report this abuse or neglect.[9]

### APPLICATION

■ It does not appear that Laura is challenging the State's evidence regarding the date of the offenses, her identity, or her failure to make a report to CPS or any law enforcement agency. Instead, we construe her point as challenging the factual sufficiency of the evidence to prove that she had cause to believe that C.W. had been abused on the five occasions in question. *See Purvis*, 4 S.W.3d at 119–20.

The first count of the information alleges that Laura failed to report that C.W. had been abused on or about November 15, 1996. Diane Brooks testified that she babysat C.W. on this date and saw bruises on her bottom and legs. Because of her concerns, she photographed the bruises. She asked Laura about them a "couple of days later." According to Brooks, Laura blamed C.W.'s maternal grandmother for the bruises and told her that she had reported the situation to her sergeant at the police department. The State offered the photographs in evidence, and they confirm the bruising about which Brooks testified.

The girlfriend of Laura's teenage son testified that she frequently visited the Whites' home during this time period. She testified that "[i]n the middle of November 1996" she saw "really big" bruises on C.W.'s bottom. She reviewed the photographs taken by Brooks and confirmed that they depict the bruises she saw on C.W. at that time.

Count two alleges that Laura failed to report that C.W. had been abused on or about August 31, 1997. Brooks testified that she noticed in August 1997 that C.W.'s ear was severely bruised. According to Brooks, C.W.'s "ear was black inside and outside and even down the neck. I mean, it was bruised. It was—it was horrible." When she asked Laura about the bruising, Laura told her that C.W. had fallen against a coffee table.

Robin Telesko also testified for the State. She began keeping C.W. in her home in August 1997.[10] She testified that she saw bruising on C.W.'s bottom the first time Laura brought C.W. to her house. Telesko immediately called Laura on her cellular phone and asked her to return and look at the bruises. She told Laura that she was going to report the matter to CPS. According to Telesko, Laura told her not to call CPS because she was working with her sergeant on the situation and was attempting to obtain custody of C.W. from Eric. She told Telesko that she feared Eric would flee with C.W. if CPS was called. Telesko also told Laura that she wanted to photograph the bruising. Laura responded that that was unnecessary because she had already done so.

The third count alleges that Laura failed to report that C.W. had been abused on or about September 19, 1997. Mary Cannon, a "fairly close" acquaintance of Laura's, testified that Laura showed her "fresh bruises all over" C.W.'s bottom and legs

---

9. "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." TEX.PEN.CODE ANN. § 6.03(b) (Vernon 1994). Thus, the *mens rea* requirement is satisfied in a failure-to-report case by proof that the defendant was aware of facts which gave her cause to believe that the child in question had been or may be abused or neglected. *See id.;* TEX.FAM.CODE ANN. § 261.109(a).

10. Telesko operated an in-home daycare service.

when she visited Laura's home around that time. When Cannon asked C.W. who had done this to her, she said Eric had. Laura confided in Cannon that "Eric was abusing [C.W]." Cannon encouraged Laura to photograph the bruises, but she did not want to. According to Cannon, Laura assured her that she did not need to call CPS because the neighbors were going to. Laura told Cannon that she would do so herself if the neighbors did not. She admitted to Cannon that she would prefer not to call CPS, however, because she was concerned about her relationship with Eric and about her job.

Count four alleges that Laura failed to report that C.W. had been abused on or about October 15, 1997. Telesko testified that she observed bruises on C.W.'s neck in mid-October 1997. Cannon also recalled seeing these bruises. C.W. told Telesko that Laura had done this to her when she "held her head in the toilet and told her this is where [she should vomit]."[11] After hearing this, Telesko called CPS. According to Telesko, CPS gave Laura a few days' notice before coming to investigate. The CPS investigation failed to substantiate the allegations.[12] Telesko later confronted Laura about the incident. Laura denied that what C.W. described had ever occurred.

The fifth count alleges that Laura failed to report that C.W. had been abused on or about February 13, 1998. Telesko testified that Laura called and asked if she could babysit her children, including C.W., on the night of February 14 while Laura and Eric went to dinner. According to Telesko, Laura and Eric had never "completely" separated, and C.W. was still living with Laura. After Laura and Eric

dropped off the children, C.W. told Telesko that her ears hurt. Telesko saw bruises on the inside and outside of both ears. She also discovered bruises on her bottom.

Telesko called the police, who responded and photographed the bruises. The State offered these photographs in evidence, and Telesko confirmed that they depict the bruises she saw that night. The investigators then went to Laura's house to discuss their findings with the Whites. According to the CPS caseworker, the Whites denied any knowledge of these bruises. However, Laura did volunteer that she had caused a bruise on the front of C.W.'s thigh several days earlier when she had spanked C.W. with a wooden paddle for lying about a bathroom accident.

Detective Renee Kamper testified that she informally interviewed Laura about the allegations. Laura confirmed to Kamper that she had told Telesko not to call CPS about the first incident because she had already reported the matter to her sergeant. According to Kamper, Laura first said that she had reported the matter to her sergeant, though she did not name the sergeant. After Kamper repeatedly asked Laura to name the sergeant, Laura ultimately denied that she had ever reported the matter to a sergeant. Laura also told Kamper that she had spoken to several friends about the abuse but did not report it to the authorities because she was trying to save her marriage and her job.

Laura testified that Eric and she separated in May 1997. She and others testified that C.W. remained primarily in Eric's care after the separation. According to Laura, she had little contact with C.W.

---

11. Apparently C.W. had become ill and vomited in a place Laura deemed inappropriate. C.W. also told Telesko that Laura had put her face in her vomit.

12. After receiving a call from CPS, Laura called Telesko and accused her of making the report. Telesko told Laura that she had not called CPS.

after the separation. She testified that she was not with C.W. on the dates alleged in the second, third and fourth counts of the information. Laura also called an acquaintance of Eric's who testified that Eric had "full custody" of C.W. after the separation and that she regularly babysat C.W. between September and December of 1997. She never saw Laura with C.W. during this time period.

Laura testified that she never saw any of these bruises and that no one ever reported anything like this to her. She accused the State's witnesses of lying. She presented the testimony of another witness who testified that she lived across the street from Laura and frequently babysat C.W. in 1996. This witness testified that she never saw any sign of bruises on C.W.

#### SUMMARY

The State's witnesses testified that C.W. remained primarily in Laura's care after the separation. They further testified that, on the first four occurrences in question, they spoke directly with Laura about their concerns that C.W. had been abused. On the last occasion, Telesko testified that Laura called and asked her to babysit her children, including C.W. C.W. told Telesko about the injuries to her ears after Laura and Eric left her and Laura's other children at Telesko's for the evening.

Laura countered this evidence with testimony that Eric had primary custody of C.W. after the separation. She denied seeing any of the bruising about which the State's witnesses testified and further denied that any of the babysitters had ever called these bruises to her attention.

After a neutral review of all the evidence, we conclude that the evidence favorable to the verdict is not "so obviously weak as to undermine confidence in the jury's determination." See Johnson, 23 S.W.3d at 11; Perkins, 19 S.W.3d at 858. We likewise conclude that the proof of Laura's guilt is not "greatly outweighed by contrary proof." See Johnson, 23 S.W.3d at 11; Perkins, 19 S.W.3d at 858. Therefore, the evidence is factually sufficient to support the jury's determination that Laura had cause to believe C.W. had been abused on the five occasions in question. Accordingly, we overrule her first point.

### VAGUENESS

Laura argues in her third point that the court erred by denying her motion to dismiss because section 261.109 is unconstitutionally vague as applied to her. She also suggests that the statute implicates First Amendment rights because it "requires an ordinary citizen to espouse a particular viewpoint regarding what constitutes child abuse or neglect."

#### PERTINENT LAW

In construing a statute, we begin with the presumption that it is constitutional. See Ex parte Granviel, 561 S.W.2d 503, 511 (Tex.Crim.App.1978) (orig.proceeding); Webb v. State, 991 S.W.2d 408, 414 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd); Kaczmarek v. State, 986 S.W.2d 287, 292 (Tex.App.—Waco 1999, no pet.). We must uphold the statute if it can be afforded a reasonable construction which renders it constitutional and effectuates legislative intent. See Ely v. State, 582 S.W.2d 416, 419 (Tex. Crim.App. [Panel Op.] 1979); Webb, 991 S.W.2d at 414; McClain v. State, 984 S.W.2d 700, 703 (Tex.App.—Texarkana 1998, pet. ref'd); accord Frisby v. Schultz, 487 U.S. 474, 483, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988); Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

■ Due process requires that a criminal statute give fair notice of that conduct which is criminally prohibited. *See Bynum v. State,* 767 S.W.2d 769, 773 (Tex.Crim.App.1989); *Smith v. State,* 959 S.W.2d 1, 24 (Tex.App.—Waco 1997, pet. ref'd); *Morris v. State,* 833 S.W.2d 624, 627 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). To determine whether the challenged statute provides fair notice (and thus is not unconstitutionally vague), we examine whether it: (1) "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited;" and (2) "provide[s] explicit standards for those who apply [it]." *Bynum,* 767 S.W.2d at 773 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)); *accord Sanchez v. State,* 995 S.W.2d 677, 689 (Tex.Crim. App.), *cert. denied,* 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999). Where no First Amendment rights are involved, we need decide only whether the statute is impermissibly vague as applied to the defendant. *See Sanchez,* 995 S.W.2d at 689; *Bynum,* 767 S.W.2d at 773–74; *Smith,* 959 S.W.2d at 24; *Morris,* 833 S.W.2d at 627; *accord Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988).

■ However, if the statute "affect[s] communication protected by the First Amendment," then a defendant has standing in some cases to challenge the statute as vague on its face, even if it does not affect her own First Amendment rights.[13] *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 59–60, 96 S.Ct. 2440, 2447, 49

L.Ed.2d 310 (1976); *accord Long v. State,* 931 S.W.2d 285, 288 (Tex.Crim.App.1996); *Smith v. State,* 772 S.W.2d 946, 950 (Tex. App.—Dallas 1989, pet. ref'd); *Al–Omari v. State,* 673 S.W.2d 892, 896 (Tex.App.— Beaumont 1983, pet. ref'd). "The exception is justified by the overriding importance of maintaining a free and open market for the interchange of ideas." *Young,* 427 U.S. at 60, 96 S.Ct. at 2447; *Al–Omari,* 673 S.W.2d at 896; *accord Morehead v. State,* 807 S.W.2d 577, 580 (Tex. Crim.App.1991).

■ Nonetheless, this exception cannot be invoked if:

● the statute's deterrent effect on legitimate expression is not "both real and substantial"; and

● the statute is "readily subject to a narrowing construction by the state courts."

*Young,* 427 U.S. at 60, 96 S.Ct. at 2447 (quoting *Erznoznik v.. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975)); *Al–Omari,* 673 S.W.2d at 896. The Supreme Court has reached this conclusion because "when considering a facial challenge it is necessary to proceed with caution and restraint, as invalidation may result in unnecessary interference with a state regulatory program." *Erznoznik,* 422 U.S. at 216, 95 S.Ct. at 2276.

■ A statute places a "real and substantial" burden on protected speech when "there [is] a realistic danger that the statute itself will significantly compromise recognized First Amendment protections

---

**13.** This rule of standing for First Amendment cases is more commonly associated with overbreadth challenges. *See, e.g., Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796–801, 104 S.Ct. 2118, 2124–26, 80 L.Ed.2d 772 (1984). Nonetheless, the Supreme Court has applied the same analysis to vagueness challenges. *See Young v. American* *Mini Theatres, Inc.,* 427 U.S. 50, 59–60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976); *see also Long v. State,* 931 S.W.2d 285, 288 (Tex. Crim.App.1996); *Smith v. State,* 772 S.W.2d 946, 950 (Tex.App.—Dallas 1989, pet. ref'd); *Al–Omari v. State,* 673 S.W.2d 892, 896 (Tex. App.—Beaumont 1983, pet. ref'd).

of parties not before the Court." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).[14] Even if the statute substantially burdens these constitutional guarantees, we will not conclude that it is unconstitutionally vague if we can narrowly construe it in such a manner "as to remove the seeming threat or deterrence to constitutionally protected expression." *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916; *accord Frisby*, 487 U.S. at 483, 108 S.Ct. at 2501; *Erznoznik*, 422 U.S. at 216, 95 S.Ct. at 2276; *Long*, 931 S.W.2d at 295. However, we "may not simply assume the legislative prerogative and rewrite a statute in order to save it if the statute is not readily subject to a narrowing construction." *Morehead*, 807 S.W.2d at 581 (quoting MELVILLE B. NIMMER, NIMMER ON FREEDOM OF SPEECH: A TREATISE ON THE FIRST AMENDMENT § 4 .11[D], at 4–156 (1984)); *accord Long*, 931 S.W.2d at 295.

### ANALYSIS

We initially address the First Amendment question to resolve the issue of whether Laura may properly assert a facial vagueness challenge. *See Young*, 427 U.S. at 59–60, 96 S.Ct. at 2447; *Long*, 931 S.W.2d at 288; *Smith*, 772 S.W.2d at 950; *Al–Omari*, 673 S.W.2d at 896; *see also Sanchez*, 995 S.W.2d at 683. Laura contends that section 261.109 implicates First Amendment rights because it "requires an ordinary citizen to espouse a particular viewpoint regarding what constitutes child abuse or neglect." The State responds that we ought not address the First

Amendment issue because White has inadequately briefed it.

■ Rule of Appellate Procedure 38.9 requires that we liberally construe briefs. *See* TEX.R.APP.P. 38.9. Unless a brief "flagrantly violate[s]" the requirements of Rule 38, we will address "every subsidiary question that is fairly included" in the issue or point under review. *Id.* 38.1(e), 38.9(a); *see also Aldrich*, 928 S.W.2d at 559 n. 1; *Chimney*, 6 S.W.3d at 688. Although very little of the argument in White's third point discusses her First Amendment contention, we will address the issue in the interest of justice. *See Aldrich*, 928 S.W.2d at 559 n. 1; *Chimney*, 6 S.W.3d at 688.

■ We first determine whether section 261.109 imposes a "real and substantial" burden on protected speech. *See Young*, 427 U.S. at 60, 96 S.Ct. at 2447; *Al–Omari*, 673 S.W.2d at 896. The essence of White's First Amendment argument is that the statute requires a person to report suspected child abuse or neglect even if she disagrees with the statutory definition for these terms. *See* TEX.FAM. CODE ANN. § 261.001(1), (4) (Vernon Supp. 2001) (defining the terms "abuse" and "neglect").

The United States Supreme Court has concluded that a statute impermissibly compels a person's speech in violation of the First Amendment when the statute requires him "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977);

---

14. Generally, statutes which impose a civil penalty are subjected to a less demanding analysis than criminal statutes when challenged for vagueness. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). However, when First

Amendment rights are implicated, the same analysis applies to both civil and criminal statutes. *Compare Taxpayers for Vincent*, 466 U.S. at 796–801, 104 S.Ct. at 2124–26 (civil) *with New York v. Ferber*, 458 U.S. 747, 768–73, 102 S.Ct. 3348, 3360–63, 73 L.Ed.2d 1113 (1982) (criminal).

*accord Glickman v. Wileman Bros. & El-liott, Inc.,* 521 U.S. 457, 470–71, 117 S.Ct. 2130, 2139, 138 L.Ed.2d 585 (1997); *Wallace v. Jaffree,* 472 U.S. 38, 51–52, 105 S.Ct. 2479, 2487, 86 L.Ed.2d 29 (1985) (quoting *Wooley* ). Although there are no Texas cases[15] pertinent to this issue, the Supreme Court of Minnesota has determined that its child abuse reporting statute does not compel speech in violation of the First Amendment. *See State v. Grover,* 437 N.W.2d 60, 64 (Minn.1989). That court held:

> we find no merit to the argument that requiring compliance with the statute might somehow interfere with the mandatory reporter's right of free speech by compelling him to espouse a viewpoint with which he may not wish to be associated. The mandatory reporting requirement of the child abuse statute compels no "expression" in the sense reflected in *Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977), in which it was held that the First Amendment prohibits laws that require an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." The statute does not compel the dissemination of an "ideological point of view," but only mandates the reporting of information—a requirement not altogether dissimilar from that imposed by the Internal Revenue Code. Moreover, a [person reporting suspected abuse] is free to include in a report that although the report is mandated because the reporter has "reason to believe" that a child has been abused, the reporter does not hold a personal belief that the child has been physically or sexually abused. *Cf. PruneYard Shopping Cen-*

*ter v. Robins,* 447 U.S. 74, 87, 100 S.Ct. 2035, 2044, 64 L.Ed.2d 741 (1980).

*Id.; see also Forest Hills Early Learning Ctr., Inc. v. Lukhard,* 661 F.Supp. 300, 313–14 (E.D.Va.1987), *rev'd on other grounds,* 846 F.2d 260 (4th Cir.1988) (child abuse reporting statute does not "burden the churches' free exercise of religion").

■ We agree with the reasoning of *Grover.* Because section 261.109 does not place a "real and substantial" burden on protected speech, we conclude that Laura has standing to assert a vagueness challenge to the statute only as it has been applied to her. *See Young,* 427 U.S. at 59–60, 96 S.Ct. at 2447; *Long,* 931 S.W.2d at 288; *Smith,* 772 S.W.2d at 950; *Al–Omari,* 673 S.W.2d at 896.

■ A statute will be found unconstitutionally vague as applied if it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *See Bynum,* 767 S.W.2d at 773; *accord Sanchez,* 995 S.W.2d at 689. Laura argues that section 261.109 fails this part of the vagueness test because it applies to laypersons as well as professionals (unlike the reporting statutes in other states) and because the statute's requirements that a person report if she "has cause to believe" that a child's physical or mental welfare "has been or may be adversely affected" are too indefinite.

■ Laura cites an annotation in *American Law Reports 4th* for the proposition that "Texas is among the minority of jurisdictions which criminalize a failure to report by *any* person." *See* Danny R. Veilleux, Annotation, *Validity, Construction, and Application of State Statute Re-*

---

15. Although there are no Texas cases on this issue, the Attorney General's office concluded in 1985 that a predecessor statute to section 261.109 did not violate a minister's First

Amendment right to freely exercise his religious beliefs. *See* Op.Tex. Att'y Gen. No. JM-342 (1985).

*quiring Doctor or Other Person to Report Child Abuse,* 73 A.L.R.4th 782, 1989 WL 571838 (1989).[16] Even assuming this is correct, the mere fact that Texas has adopted a universal reporting requirement does not render section 261.109 vague.[17] The test is whether the statute "give[s] the person of ordinary intelligence [professional or layperson] a reasonable opportunity to know" when suspected abuse must be reported. *See Bynum,* 767 S.W.2d at 773; *accord Sanchez,* 995 S.W.2d at 689.

■ Section 261.109(a) criminalizes a person's knowing failure to report if she "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect." Tex.Fam.Code Ann. § 261.109(a). Laura looks to similar statutes in other states which require a person to report if she has *reasonable* cause to believe abuse has occurred. *See, e.g.,* Ga.Code Ann. § 19–7–5(c)(1) (Harrison 1995); Ky .Rev.Stat.Ann. § 620.030(1) (Michie 1999); Wis.Stat.Ann. § 48.981(2) (West Supp.2000); *see also* Cal.Penal Code § 11166(a) (West Supp.2001) (requiring a report when a person "reasonably suspects" abuse has occurred). She contends that this type of "reasonable cause" or "reasonable suspicion" standard is the minimum necessary to provide fair notice of when a person has a duty to report. We disagree.

Webster's defines "cause" in part as "sufficient reason." Merriam-Webster's Collegiate Dictionary 182 (10th ed.1993); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 501, 102 S.Ct. 1186, 1194–95, 71 L.Ed.2d 362 (1982); *Bynum,* 767 S.W.2d at 774; *Purnell v. State,* 921 S.W.2d 432, 435 (Tex.App.—Houston [1st Dist.] 1996, pet. ref'd) (each applying dictionary definitions to determine whether statute vague). We review the evidence concerning the allegations of the information to see whether Laura had "sufficient reason" to believe C.W. had been abused.

■ Laura is (or was) a certified peace officer and a licensed vocational nurse. Thus, she has some specialized training and experience in recognizing when child abuse has occurred. In fact, an internal affairs officer testified that Laura had received thirty-three hours "of child abuse detection and recognition training" as an officer. Laura testified that she had called on CPS "dozens of times" to assist in cases involving child abuse. The record reflects that Brooks and/or Telesko called Laura's attention to the bruises which form the

---

**16.** The annotation reads in pertinent part:

The reporting statutes also vary concerning the class of persons required to report. All of the statutes require physicians to report suspected abuse, and frequently list particular medical practitioners within the class of mandatory reporters. However, the class of persons required by all statutes to report suspected child abuse has been expanded to include not only physicians, but also teachers, child-care workers, social workers, law enforcement personnel, doctors, nurses, and a variety of other medical and nonmedical professionals. The various statutes frequently require reports by hospital administrators, pharmacists, laboratory technicians, principles [sic], school admin-istrators, and clergymen. *Many jurisdictions make the requirement universal by providing that all citizens must report cases of suspected abuse.*

Danny R. Veilleux, Annotation, *Validity, Construction, and Application of State Statute Requiring Doctor or Other Person to Report Child Abuse,* 73 A.L.R.4th 782, 790–91, 1989 WL 571838 (1989) (footnotes omitted) (emphasis added).

**17.** Section 261.101 provides separate reporting requirements for laypersons and professionals. *See* Tex.Fam.Code Ann. § 261.101 (Vernon Supp.2001). Subsection (a) applies to the former, and subsection (b) to the latter. *Id.*

basis for the first, second, and fourth counts. Laura told them on each occasion that the matter had been reported to authorities. Laura herself showed Cannon the bruises relative to count three and assured her that CPS would be notified. Regarding the last count, the record contains evidence that C.W. was in Laura's care at that time. Laura admitted to Kamper that she knew C.W. had been abused but did not report it because she was trying to save her marriage and her job.

For these reasons, we conclude that section 261.109, as applied in this case, gave Laura, a certified peace officer, fair notice of that conduct which is criminally prohibited. *See Morris*, 833 S.W.2d at 627. We similarly hold that the statute as applied provides sufficiently explicit standards to guide law enforcement officials. *See Sanchez*, 995 S.W.2d at 689; *Bynum*, 767 S.W.2d at 773. Accordingly, we overrule Laura's third point.

## WARRANTLESS SEIZURE

Laura argues in her fifth point that the court abused its discretion by overruling her objection to the State's introduction in evidence of a photograph of a wooden paddle which officers took from her home without a warrant. The State responds that Laura invited the officers to enter her home on the occasion in question and that the paddle was in plain view.

■ We review a court's ruling on the admission of evidence under an abuse-of-discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App. 1996); *Kelley v. State*, 22 S.W.3d 642, 644 (Tex.App.—Waco 2000, pet. ref'd). We will not reverse such a ruling so long as it falls "within the 'zone of reasonable disagreement.'" *Green*, 934 S.W.2d at 102 (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g)); *accord Kelley*, 22 S.W.3d at 644.

Lieutenant W.H. Mitchell and others went to Laura's home after responding to Telesko's call on February 14, 1998 and observing the bruises on C.W.[18] Lieutenant Mitchell was an investigator in the internal affairs division of the Fort Worth Police Department. He explained that he was summoned to conduct an administrative investigation because Laura and Eric were officers with the department. Mitchell testified that Laura invited the officers into her house. She had the officers wait in the living room while she went downstairs to awaken Eric. She returned with him about fifteen minutes later.

The officers asked Laura and Eric about C.W.'s injuries. Although they denied any knowledge of C.W.'s then-existing injuries, Laura did admit that she had previously paddled C.W. with the same paddle Eric and she used on her older children. After further discussion, Laura went to another room with the CPS caseworker to share her suspicions about Eric. At that point, another officer noticed a paddle lying on the couch and pointed it out to Lieutenant Mitchell. The officers asked Eric if it was the paddle about which Laura had told them. He said that it was. The officers seized the paddle as evidence.

---

18. When Lieutenant Mitchell began to testify about recovering a wooden paddle from Laura's home, Laura's counsel objected, and the court excused the jury from the courtroom. The court then held a hearing outside the jury's presence on the propriety of the State's warrantless seizure of the paddle. *See Oliver v. State*, 10 S.W.3d 411, 414 (Tex.App.—Waco 2000, no pet.) ("accused retains the right to object at trial to evidence she alleges to have been unlawfully seized"). The vast majority of Mitchell's testimony pertinent to this issue was given outside the jury's presence.

Laura asked the court to exclude a photograph of the paddle because the paddle had been seized without a warrant and because Mitchell's status as an internal affairs investigator rendered any consent Laura allegedly gave him involuntary because of duress. The court overruled the objection and later admitted the photograph in evidence before the jury.

Laura testified later [19] that she asked Mitchell if they could talk on her front porch to which he responded, "No, he needed to come in." According to Laura, Mitchell, another lieutenant, two other officers, and the CPS caseworker all entered her home despite her request that they stay on the porch. She testified that the paddle the officers found had been "stuffed down" in a magazine rack in which she kept magazines and newspapers and was not in plain view.

■ It would seem logical that we consider only Lieutenant Mitchell's testimony in determining whether the court abused its discretion in overruling Laura's objection. However, the practice of the Court of Criminal Appeals has been to consider subsequently-offered testimony relevant to this type of issue to avoid "plac[ing] the appellate court in the untenable position of having to reverse a conviction in the face of a record which supports, albeit belatedly, the trial court's ruling." *Webb v. State*, 760 S.W.2d 263, 272 n. 13 (Tex.Crim.App. 1988); *accord Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim.App.1996); *Barley v. State*, 906 S.W.2d 27, 31 n. 2 (Tex.Crim. App.1995); *In re A.D.D.*, 974 S.W.2d 299, 305 (Tex.App.—San Antonio 1998, no pet.). Accordingly, we consider both Mitchell's and Laura's testimony in deciding the issue presented.

■ The issue of whether Laura voluntarily consented to the officers' entry into her home is a fact question to be determined from the totality of the circumstances. *See Carmouche v. State*, 10 S.W.3d 323, 331 (Tex.Crim.App.2000) (citing *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996)); *White v. State*, 21 S.W.3d 642, 645 (Tex. App.—Waco 2000, pet. ref'd). Under article I, section 9 of the Texas Constitution, the State bears the burden of proving by clear and convincing evidence that Laura voluntarily consented to the officers' entry. *See State v. Ibarra*, 953 S.W.2d 242, 245 (Tex.Crim.App.1997); *accord Carmouche*, 10 S.W.3d at 331; *White*, 21 S.W.3d at 645–46. "For the consent to be voluntary, it must not be the product of duress or coercion, actual or implied." *White*, 21 S.W.3d at 645 (citing *Carmouche*, 10 S.W.3d at 331).

■ In addition to the consent question, Laura's fifth point concerns the "plain view" exception to the warrant requirement. Under this recognized principle, an officer may lawfully seize evidence without a warrant if: (1) he observes evidence in plain view from a location where he has a right to be; and (2) the incriminating nature of the evidence is "immediately apparent." *See Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)); *see also Martinez v. State*, 17 S.W.3d 677, 685 (Tex. Crim.App.2000).

■ We review the court's resolution of these issues under the standard articulated in *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *accord Carmouche*, 10 S.W.3d at 327; *White*, 21

---

19. After Mitchell concluded his testimony, the State called one additional witness before resting its case-in-chief. Laura called four witnesses before she took the stand herself.

S.W.3d at 645. We give "almost total deference to [the] court's determination of the historical facts," particularly when the court's determination depends on an evaluation of the credibility and demeanor of the witnesses who testify to those facts. *Guzman,* 955 S.W.2d at 89; *accord Carmouche,* 10 S.W.3d at 327; *White,* 21 S.W.3d at 645.

■ Lieutenant Mitchell testified that Laura invited the officers to enter her home and that the paddle lay in plain view. Laura denied that she consented to the officers' entry or that the paddle lay in plain view. Although she acknowledged in her testimony that Mitchell was an internal affairs investigator, she did not testify that she felt any duress or coercion because of his status, at least not regarding the officers' entry into her home.[20]

The resolution of these issues revolves almost totally around the court's evaluation of the credibility and demeanor of these two witnesses. Accordingly, we give great deference to the court's resolution of these issues. *See id.* Because the record supports the court's determination that Laura consented to the officers' entry in her home and that the paddle lay in plain view, we conclude that the court did not abuse its discretion by admitting a photograph of the paddle in evidence. *See Green,* 934 S.W.2d at 101–02; *Kelley,* 22

S.W.3d at 644. Thus, we overrule Laura's fifth point.

## LIMITATIONS INSTRUCTION

Laura contends in her second point that the court erred by denying her requested instruction to the jury regarding the applicability of the statute of limitations to the first count of the information.[21] The State responds that the court adequately charged the jury on this issue.

■ If a defendant raises the statute of limitations as a defense, "then the State must prove beyond a reasonable doubt that the prosecution is not limitations-barred." *Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim.App.1998).[22] A two-year statute of limitations applies to misdemeanor offenses. *See* TEX.CODE CRIM .PROC.ANN. art. 12.02 (Vernon 1977). The date of the offense and the date the indictment or information is presented are not included in the computation. *Id.* art. 12.04 (Vernon 1977).

■ Article 12.05 of the Code of Criminal Procedure provides for a tolling of the statute of limitations "during the pendency of an indictment, information, or complaint." TEX.CODE CRIM.PROC.ANN. art. 12.05(b), (c) (Vernon 1977). Thus, article 12.05 operates as a constraint on the limitations defense. *Cf. Smith v. State,* 965 S.W.2d 509, 512 (Tex.Crim.App.1998) (pro-

---

**20.** Laura did testify that as her conversation with Mitchell and the others progressed, Mitchell raised his voice and "[h]is face was turning red." She continued, "I knew ... what was going to happen after that point. With IAD, they will get into your life and twist everything."

**21.** Laura does not raise a similar challenge with respect to the remaining four counts of the information.

**22.** Formerly, the State bore the burden of pleading and proving those facts which tolled

the statute of limitations. *See Vasquez v.. State,* 557 S.W.2d 779, 783 n. 5 (Tex.Crim. App.1977); *Willis v. State,* 932 S.W.2d 690, 695 (Tex.App.—Houston [14th Dist.] 1996, no pet.); *State v. Hall,* 794 S.W.2d 916, 918 (Tex.App.—Houston [1st Dist.] 1990), *aff'd,* 829 S.W.2d 184 (Tex.Crim.App.1992). However, the Court of Criminal Appeals has since rejected these precedents and concluded that the defendant has the burden to assert the statute of limitations as a defense. *See Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim. App.1998).

voking the difficulty "acts as a limitation or total bar on a defendant's right to self-defense"). Before the court can charge the jury on the tolling provisions of article 12.05, the record must contain "sufficient evidence" that a former indictment, information or complaint was pending in a court of competent jurisdiction for a sufficient length of time as to make the present charging instrument timely. *Id.* at 513 (setting forth requirements for a provocation charge); *see also* TEX.CODE CRIM.PROC. ANN. art. 12.05(b), (c).

The offense stated in the first count of the information allegedly occurred "on or about November 15, 1996." The parties appear to accept November 15 as the date of this offense. We shall do likewise. Thus, the State had to present an indictment or information against Laura no later than November 16, 1998 to satisfy the limitations statute. *See Rendon v. State,* 695 S.W.2d 1, 5 (Tex.App.—Corpus Christi 1984, pet. ref'd).

 The grand jury presented an indictment against Laura on August 20, 1998, before limitations ran. The indictment was filed in the County Criminal Court No. 10, a court with jurisdiction over the offense alleged.[23] *See* TEX.GOV.CODE ANN. § 25.2223(a) (Vernon Supp.2001). The State filed the information against Laura on March 10, 1999. The indictment remained pending when the State filed the information. The trial court took judicial notice of these facts .[24] *See* TEX.R.EVID. 201(g).

The court charged the jury as follows on the issue of limitations:

You are further charged as the law in this case that the State is not required to prove the exact date alleged in the information, but may prove the offense, if any, to have been committed at any time prior to the filing of the information so long as said offense, if any, occurred within two years of the date of the filing of the information.

In determining whether the information in this case was filed within two years of the date of the offense, if any, you shall not compute any time during the pendency of an indictment or information toward the two year limit.

The Court has taken judicial notice that on August 20, 1998 an indictment was filed in this court charging the defendant Laura I White, with the offense of failure to report child abuse, and said indictment was pending on March 10, 1999, the date that this information was filed.

You are further instructed that the jury may, but is not required to, accept as conclusive any fact judicially noticed.

The court further charged the jury in the application paragraph relative to count one that, in order to convict Laura of the offense alleged in the first count, the jury

---

23. Although misdemeanor prosecutions are usually initiated by the filing of an information, the State may also choose to initiate a misdemeanor prosecution by indictment. *See, e.g., Ex parte Austin Indep. Sch. Dist.,* 23 S.W.3d 596, 598 (Tex.App.—Austin 2000, no pet.).

24. The indictment did not specifically allege a November 15, 1996 offense. Rather, the indictment alleged that the offense occurred "on or about August 31, 1997." Because it did not specify a precise date, it would have permitted the State to prove that the offense occurred at any time during the two-year period before presentment (*i.e.,* from August 19, 1996 to August 19, 1998). *See Sledge v. State,* 953 S.W.2d 253, 256 (Tex.Crim.App. 1997); *Wilson v. State,* 3 S.W.3d 223, 226 n. 3 (Tex.App.—Waco 1999, pet. ref'd). Therefore, the "on-or-about" allegation of the indictment necessarily included the November 15, 1996 offense alleged in count one of the subsequently-filed information.

had to find beyond a reasonable doubt that she committed the offense alleged and had to:

> further find that on the 20th day of August, 1998, an information or indictment was filed in this court charging said defendant with the above charged offense and thereafter on the 10th day of March, 1999, the said information or indictment was pending in said court at the time this information was filed....

Laura requested an instruction which did not reference the August 1998 indictment and had no language regarding the tolling provisions of article 12.05.

The essence of Laura's argument is that the indictment did not toll the limitations period. However, she provides no reasoning to support this argument. When the time period during which the August 1998 indictment was pending is excluded from the period between the date of the offense and the date the March 1999 information was filed, the allegation of count one of the information is not limitations-barred. *See* Tex.Code Crim.Proc.Ann. art. 12.05(b), (c). Because of this, the court properly instructed the jury on the tolling effect of the indictment and properly denied Laura's requested instruction. Accordingly, we overrule her second point.

We affirm the judgment.

Justice GRAY concurring.

GRAY, Justice, concurring.

We do not decide constitutional issues unless required to do so for disposition of the case. *San Antonio General.Drivers, etc. v. Thornton,* 156 Tex. 641, 299 S.W.2d 911, 915 (Tex.1957). In this case we should not address the question of whether it is a violation of the First Amendment to require the reporting of suspected child abuse. The issue is not adequately raised or discussed in White's brief.

## Issue on Appeal

In three different places, White states her issue on appeal. White never included in the issue that she was challenging the statute on an alleged violation of the First Amendment's freedom of speech clause. The issue is twice stated as follows:

> The trial court erred by denying appellant's motion to dismiss when the statute upon which the prosecution was based was unconstitutionally vague as applied to appellant.

The third time that the issue is stated in White's brief it is stated as follows:

> The trial court erred by denying appellant's motion to dismiss when the statute upon which the prosecution was based was unconstitutionally vague *on its face and as* applied to appellant.

The italicized portion is the only difference from the prior two statements of the issue on appeal. There is no explanation for the differences in the statement of the issue in White's brief. Neither statement of this issue asserts that the statute violates the First Amendment.

## Argument on Appeal

By reviewing the argument under White's issue we should be able to determine the nature of her complaint. Her opening paragraph is as follows:

> Appellant contends that the statutes upon which the prosecution was based in this case is so vague on its face and as applied to her that it offends her right to Due Process under the Fourteenth Amendment of the United States Constitution, and Article 1 Section 19 of the Texas Constitution, and Article 1.04 of the Texas Code of Criminal Procedure. Appellant filed a Motion to Dismiss based on this ground, which was denied by the Trial Court. After the close of the State's case-in-chief, Appellant

reurged this motion, which was again denied by the Trial Court.

White's brief then continues for over five pages discussing the due process arguments as outlined in the opening paragraph under her issue. The argument is multifarious and should not be considered. Issues raised under both the Federal and Texas Constitutions must be briefed and argued separately. *O'Hara v. State,* 27 S.W.3d 548, 550 n. 9 (Tex.Crim.App.2000).

A review of the arguments made in the motion to dismiss, which is referenced in the paragraph quoted above, reveals that the First Amendment issue was not part of the argument in the trial court. Accordingly, we cannot use that reference as a means to bootstrap White's First Amendment argument into her brief.

The central theme of her vagueness argument is contained in the following excerpt from her brief:

Appellant would argue that the Texas statute does not apply a **reasonable person standard,** or any other standard and does not give a person or [sic] ordinary intelligence fair notice of what conduct the statute attempts to require. Specifically, Appellant argues that the statute did not give **her** fair notice of what conduct the statute attempted to require and is vague so [as] to offend her Due Process rights under the Fifth and Fourteenth Amendments to the United States Constitution. (emphasis in original)

This is the only argument we should address under White's issue as presented.

### BRIEF ON THE FIRST AMENDMENT ISSUE

The brief on the First Amendment issue is wholly inadequate to present an issue for our review. To avoid the waste of judicial resources, resources paid for by the taxpayers, briefs must comply with the rules of appellate procedure. "The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX.R.APP.P. 38.1(h).

White's brief of the First Amendment issue does not meet this simple rule. *Cavender v. State,* 42 S.W.3d 294 (Tex.App.— Waco 2001, n. pet. h.). White's brief contains no references to authorities or the record. It is insufficient. *Id.* The totality of White's brief on the First Amendment argument is contained in four lines at the end of her brief under this issue, obviously as an afterthought. The entire argument is as follows:

Additionally, Appellant would show that Section 261.101, Texas Family Code is unconstitutionally vague and overly broad on its face, because the right to free speech under the First Amendment to the United States Constitution is implicated. The statute as written requires an ordinary citizen to espouse a particular viewpoint regarding what Constitutes child abuse or neglect.

The State challenged the sufficiency of White's brief on the First Amendment issue. White did nothing in response to the State's argument that the brief was inadequate. *See id.* We should not address this very important constitutional issue when the issue has not been properly briefed and presented for our review.

### CONCLUSION

Because I cannot join in addressing the first amendment issue, I express neither agreement or disagreement with the majority's analysis of the issue. Because the majority reaches the result that the trial court's judgment will not be reversed on this ground, the majority reaches the same result that I would reach by not consider-

ing the issue. Accordingly, I concur in the judgment.