

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JAVIER URIAS, | § | No. 08-12-00090-CR |
| Appellant, | § | Appeal from the |
| v. | § | 243rd District Court |
| STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20090D03338) |

## O P I N I O N

Javier Urias appeals his conviction of injury to a child causing serious bodily injury. In two issues, Appellant challenges the legal sufficiency of the evidence and the admission of a medical doctor's expert testimony over his *Daubert*[1] and Confrontation Clause objections. We affirm.

## BACKGROUND

Prior to the incident in question in 2009, Appellant had been dating Roxanne Alvarado ("Roxanne"), mother of a four-year-old boy, a two-week-old boy, and fifteen-month-old Dominic Jacob Alvarado ("Jacob"), for about eight months. None of Roxanne's sons were Appellant's biological children. Appellant and Roxanne resided together in a studio apartment that was part of a three-apartment building. Roxanne's two aunts resided in the other units.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Roxanne's youngest son was born premature, so Roxanne went to the hospital twice a day following his birth to feed him and learn appropriate care methods. Appellant usually accompanied Roxanne to the hospital during these visits. During this time, Roxanne, Appellant, and Roxanne's two aunts were the only people who took care of Roxanne's sons. Roxanne testified that she trusted Appellant with her children, and Roxanne's aunt Guadalupe Salas testified that Appellant usually treated Roxanne's children appropriately. On Mach 25, 2009, Roxanne left Appellant in charge of Jacob while she went to the hospital. Salas had watched Jacob the prior day. Salas testified that Jacob had been in good health that day, and neither she nor her sister Yolanda had hit Jacob or caused him any injury. Roxanne also denied hitting Jacob and denied any knowledge of any prior head injuries. Appellant did not testify in his own defense. His account as relayed through a 911 call recording and his statements to police indicates that Appellant claimed he had placed Jacob on a bed while changing his diaper. While Appellant left the room to get supplies, he heard Jacob screaming, and when he returned, the baby was on the floor. When Appellant picked him up, Jacob was clenching his jaw and breathing irregularly. At some point, Jacob lost consciousness, and Appellant "tried to slap him around a little bit to wake him up." Appellant called 911.

When paramedics arrived, Jacob was breathing but unconscious and unresponsive. Appellant told them that Jacob had fallen off the bed and that he had cried before becoming unconscious. One paramedic testified that Jacob had no apparent physical injuries beyond a bruise on his forehead and a small cut on his chin, both of which were "old." Paramedics subsequently took Jacob by ambulance to R.E. Thomason General Hospital, now known as University Medical Center ("UMC"), in El Paso.

Jacob arrived at the hospital semi-conscious and nearly in a coma. A team of medical

personnel led by Dr. Alan Tyroch treated Jacob at UMC. The hospital admitted Jacob as a Level I trauma patient. An X-ray bone scan showed that Jacob had no visible bone fractures. A CT scan of Jacob's head indicated the presence of blood from two separate subdural hematomas, one chronic – i.e., between three weeks and four months old – and one acute, taking place within 72 hours of the scan. Dr. Fadi Hanbali, a neurosurgeon on Jacob's treatment team, testified that subdural hematomas occur when blood vessels in the skull rupture as a result of trauma and blood begins to accumulate between the brain and the dura, a hard membrane encasing the brain inside the cranium. In Jacob's case, the subdural hematoma had caused a 9-millimeter midline shift of the brain, meaning that accumulating blood had forced Jacob's brain to one side of the skull. Dr. Hanbali characterized the 9-mm midline shift as a serious medical emergency that could result in death. He testified that he performed surgery to stem the bleeding and evacuate blood from inside the dura, thereby relieving pressure on the brain.

Following surgery, Dr. Tyroch asked Dr. Neil Adams, an ophthalmologist, to perform an eye exam on Jacob. Dr. Adams, who did not testify at trial, noted the presence of retinal bleeding in Jacob's medical file. Both Dr. Hanbali and Dr. Tyroch testified that retinal hemorrhaging was not consistent with a fall from the bed and suggested instead that Jacob had been shaken fairly vigorously. Dr. Tyroch further testified that although it was possible that the previous subdural hematoma made Jacob more susceptible to getting the acute hematoma from a short fall from the bed, the presence of retinal bleeding and absence of recent visible trauma suggested that the injury stemmed from a caretaker's intentional shaking of the child and not an accidental fall.

The jury returned a guilty verdict against Appellant. He was sentenced to forty-five years' in prison.

3

## I.

In Issue One, Appellant contends that the evidence is legally insufficient to support a jury finding that he caused Jacob's serious injuries. We disagree.[2]

### *Standard of Review*

In assessing the legal sufficiency of a verdict, we review all the evidence in the record, both "properly and improperly admitted[,]" in "the light most favorable to the prosecution" to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)[Emphasis omitted]. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.*, *citing Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Our role on legal sufficiency review is not to usurp the jury and replace its verdict with our own; instead, we serve as a procedural safeguard, ensuring that whatever verdict the jury rendered comports with due process. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000); *Johnson v. State*, 967 S.W.2d 410, 412 (Tex.Crim.App. 1998). "In conducting this review, we must defer to the jury's role as the sole judge of the credibility and weight that testimony is to be afforded." *Castaneda v. State*, 08-10-00050-CR, 2011 WL 4490960, at *4 (Tex.App.--El Paso Sept. 28, 2011, pet. ref'd)(not designated for publication).

### *Analysis*

Appellant complains that the State, at best, merely presented the jury with conflicting, equally plausible guilt and innocence scenarios that cannot establish proof of guilt beyond a

---

[2] As a threshold matter, the State objects to Appellant's briefing of Issue One, arguing that it is deficient under TEX.R.APP.P. 38.1 and thus presents nothing for our review. We overrule the State's objection and find that Issue One of Appellant's brief complies with the Rules of Appellate Procedure.

4

reasonable doubt as a matter of law.  *See Clark v. Procunier*, 755 F.2d 394, 396 (5th Cir. 1985)(where evidence gives near-equal weight to theories of guilt and innocence, reasonable doubt precluding a guilty verdict exists and a defendant is entitled to acquittal).  However, the "introduction of conflicting evidence does not render evidence insufficient."  *Castaneda*, 2011 WL 4490960, at *4.  The Court of Criminal Appeals has instructed the courts of appeals to presume that "[w]hen the record supports conflicting inferences . . . the factfinder resolved the conflicts in favor of the prosecution[.]"  *Clayton*, 235 S.W.3d at 778.  The ultimate question we answer in Issue One is whether any rational trier of fact could find that the State has proved every element of an offense beyond a reasonable doubt.  *Clayton*, 235 S.W.3d at 778.  Here, we find the State met its burden.

Appellant complains specifically that the State failed to provide evidence that Jacob's injuries were non-accidental, or that the injuries occurred while Appellant had sole care, custody, and control of Jacob, which would give rise to a permissible inference that he caused the injury.  *See Castaneda*, 2011 WL 4490960, at *5 (evidence is sufficient for injury to a child conviction where it shows "an adult defendant has had sole access to a child at the time the child sustained her injuries . . . ."); *Garcia v. State*, 16 S.W.3d 401, 405 (Tex.App.--El Paso 2000, pet. ref'd)(listing cases holding same).

The medical testimony is dispositive on these issues.  The medical experts testified that although the CT scan could only establish that the blood began pooling between the brain and the dura at some point within seventy-two hours of the scan, the bleeding likely began shortly before Jacob exhibited symptoms, given that (1) a child's brain is larger in relation to the skull than an adult's brain, which hastens the onset of a subdural hematoma's neurological symptoms in children; (2) the presence of old blood from the second, undetected subdural hematoma would

5

have reduced the space inside the cranium even further before the second bleed began; and (3) Jacob arrived at the hospital semi-conscious in spite of his brain having shifted nine millimeters off-center, whereas a subdural hematoma that serious in a child that age likely would have rendered him totally comatose as he approached the seventy-two-hour window limit. Dr. Tyroch further testified that while the first healed-over subdural hematoma could have made Jacob more susceptible to a bleed from accidentally falling off the bed, the lack of any discernable trauma on Jacob's body combined with the presence of retinal bleeding indicated to him that Jacob's injuries stemmed from being shaken vigorously.

Based on this testimony, a rational juror could infer that Jacob sustained a subdural hematoma at the time he was in Appellant's sole care, custody, and control. A rational juror could also infer based on the presence of retinal hemorrhaging that the injury was caused by vigorous shaking and not by accident, some prior injury, or a congenital defect. Taking those two factors together, a rational juror could find guilt beyond a reasonable doubt on the charge levied in the indictment. The evidence is legally sufficient.

Issue One is overruled.

## II.

In Issue Two, Appellant maintains that the trial court erred by admitting, over his objections on *Daubert* and Confrontation Clause grounds, portions of Dr. Tyroch's testimony. Specifically, Appellant complains that Dr. Tyroch's testimony about Jacob's retinal hemorrhaging stemmed from the medical report of Dr. Adams, the ophthalmologist with whom Dr. Tyroch consulted during treatment who did not testify at trial. Because Appellant could not cross-examine Dr. Adams regarding his medical findings, Appellant contends his confrontation rights were violated under *Bullcoming v. New Mexico*, — U.S. —, 131 S.Ct. 2705, 180 L.Ed.2d

6

610 (2011). The State raises a bevy of briefing and preservation of error issues before arguing alternatively that Dr. Adams' medical report was not "testimonial" under the Sixth Amendment. We address each issue in turn.

### *Inadequate Briefing on Daubert Issue*

In its response, the State contends that Appellant failed to adequately brief the *Daubert* issue. We agree. Although the Court is mindful of its duty to liberally construct briefs in assessing compliance with the Rules of Appellate Procedure, *see* TEX.R.APP.P. 38.9; *White v. State*, 50 S.W.3d 31, 45 (Tex.App.--Waco 2001, pet. ref'd), Appellant has failed to comply with TEX.R.APP.P. 38.1(i). His argument section sets out the standard of review for *Daubert* challenges before Appellant states that "[b]ased on the totality of the evidence it is appellant's position that State [sic] failed to establish the etiology of the injury and therefore to prove its causal link to the defendant." Even under the most liberal construction of his brief, Appellant failed to challenge Dr. Tyroch's credential or methodology, nor did he apply the law to any facts beyond this conclusory assertion. As such, we find that nothing has been presented for appellate review on this issue.

The *Daubert* sub-point of Issue Two is overruled on inadequate briefing grounds.

### *Preservation of Error*

The State further argues that Appellant failed to preserve error on the admission of Dr. Adams' retinal bleeding diagnosis because he failed to timely object to testimony and because his argument on appeal fails to comport with the objection made at trial. We agree that Appellant failed to preserve error.

"To be timely, a request, objection, or motion must be made at the earliest opportunity." *Casey v. State*, 349 S.W.3d 825, 834 (Tex.App.--El Paso 2011, pet. ref'd). "An objection must

be made each time inadmissible evidence is offered unless the complaining party obtains a running objection or obtains a ruling on his complaint in a hearing outside the presence of the jury." *Garza v. State*, No. 08-11-00035-CR, 2012 WL 1883118, at *2 (Tex.App.--El Paso May 23, 2012, pet. ref'd)(not designated for publication). Further, an objection does not preserve error unless the trial court rules on the objection or the complaining party objects to the trial court's refusal to rule. TEX.R.APP.P. 33.1(a)(2).

Here, Appellant failed to preserve error for two reasons. First, Appellant failed to obtain a ruling on the confrontation objection. Instead, the record shows that Appellant lodged an objection arguably on confrontation grounds, among other grounds, before the court allowed him to take Dr. Tyroch on voir dire at a *Daubert* hearing. Following that hearing, Appellant objected to Dr. Tyroch's testimony on the basis that it was cumulative. The trial court overruled the objection and noted that it found Dr. Tyroch to be qualified to testify as an expert. Appellant then requested running objections on the issues of relevance, cumulative presentation of evidence, improper bolstering, "asked and answered," and on Dr. Tyroch's qualifications. The trial court granted running objections only on the issues of relevance and cumulative presentation. The record does not indicate that the trial court ever ruled on the confrontation grounds Appellant advanced in his pre-*Daubert* hearing objection. As such, no error is preserved.

Second, Appellant waived his objection on the basis of timeliness. Appellant's counsel failed to object to the discussion of retinal bleeding during Dr. Hanbali's testimony prior to Dr. Tyroch relaying the same information to the jury. Appellant's counsel claims he refrained from objection during Dr. Hanbali's testimony because Dr. Adams was designated as a possible witness on the State's witness list for trial, and it was his understanding that Dr. Adams would

8

testify. When counsel realized that Dr. Adams would not testify, he maintains he objected, informed the trial court of the situation, and requested a limiting instruction from the court. However, this is not enough to preserve error on confrontation grounds. Counsel should have objected at the first mention of the retinal bleeding if he wished to preserve the issue for appeal. *Casey*, 349 S.W.3d at 843.

Finally, even if error was properly preserved, the Sixth Amendment prohibits the introduction only of *testimonial* statements from unavailable declarants not previously subjected to cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 1369, 158 L.Ed.2d 177 (2004). Dr. Adams statements were not "testimonial" for *Crawford* purposes, given that they were made for the primary purpose of rendering medical treatment and obtaining a differential diagnosis between accidental injury and intentional trauma. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2, 129 S.Ct. 2527, 2533 n.2, 174 L.Ed.2d 314 (2009); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex.App.--San Antonio 2009, pet. ref'd)(admission of unavailable sexual assault nurse examiner's report through a surrogate did not violate *Crawford* because report compiled for non-testimonial medical treatment purposes); *Perez v. State*, No. 14-11-01102-CR, 2013 WL 655714, at *7-*8 (Tex.App.--Houston [14th Dist.] Feb. 21, 2013, no pet.)(mem. op., not designated for publication)(absent direct evidence of physician's purpose in questioning patient, trial court does not abuse its discretion in ruling physician's report is non-testimonial and made for medical purposes).

Issue Two is overruled. We affirm Appellant's conviction.

March 26, 2014

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)